# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

EDWARD S. WOLVIN,

        **Plaintiff,**

   v.                          **Case No. 08-CV-476**

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

        **Defendant.**

---

## DECISION AND ORDER REVERSING THE DECISION OF THE COMMISSIONER AND REMANDING THE CASE

---

### I. PROCEDURAL HISTORY

Edward S. Wolvin ("Wolvin") appeals the decision of the Commissioner of Social Security ("the Commissioner") denying Wolvin's application for Disability Insurance Benefits ("DIB"). (R. 26-29). Wolvin filed an application for DIB on August 2, 2005, alleging disability beginning July 25, 2005. (R. 39-41). The application for DIB was denied initially on September 7, 2005. (R. 24). Wolvin's request for reconsideration was subsequently denied on November 10, 2005. (R. 25). Wolvin timely requested a hearing, and on November 7, 2007, Wolvin appeared and testified in a hearing before Administrative Law Judge ("ALJ") Arthur Schneider. (R. 35, 461-91). ALJ Schneider issued a decision dated December 19, 2007, denying Wolvin's application for DIB. (R. 11-18). Wolvin sought a review of ALJ Schneider's decision, but the request for review was denied by the Social Security Administration's Appeals Council on March 26, 2008. (R. 4-6). The present action was commenced on May 29, 2008. (Docket No. 1).

## II. FACTS

Edward Wolvin was born on October 20, 1963 and was 44 years old at the time of his hearing before the ALJ. (R. 465). Wolvin weighs approximately 215 pounds, and stands at a height of 6' 2". (Id.). He has a 12th grade education and previous work experience as a die cast operator and fork lift operator. (R. 56). Wolvin has both disability insured and fully insured status. (R.42-43). Wolvin has a long history of lower back pain. (R. 169). The record shows, after an MRI performed May 14, 2003 at the request of Dr. Kahle, an orthopedic surgeon, Wolvin was diagnosed with degenerative disc disease, but he was told he was not a surgical candidate. (R. 169, 172). Wolvin's last day of work was in July of 2005, when his lower back pain "progressively worsened." (R. 465, 187).

**Medical Records**

Wolvin's medical history indicates that over the course of the last five years, he has received treatment from several doctors and physical therapists for his lower back pain. (R. 113-194). Under the care of physicians, Wolvin has also been prescribed numerous pain medications as part of his treatment plans for his lower back pain. (R. 155, 174, 185, 190). When his lower back pain had progressively worsened, Wolvin sought medical attention from Dr. Mark Hansen, Wolvin's primary care physician, on March 3, 2005. (R. 187, 189, 191). Dr. Hansen recommended Wolvin be taken off of work for 3-4 weeks for physical therapy to learn appropriate body mechanics and abdominal bracing. (R. 187).

Dr. Darren Bean, an emergency room physician, treated Wolvin on April 20, 2005 when Wolvin was taken to the hospital after he was unable to get up off his basement floor due to back pain. (R. 185). Dr. Bean prescribed Dilaudid intravenously, as well as Toradol and Phenergan, which Wolvin reported reduced his pain and enabled him to walk again. (R. 185). Dr. Bean

-2-

discharged Wolvin with additional pain relief prescriptions including Percocet, Naprosyn, and Valium. (R. 185). Two weeks later, in follow up visits to both Therese Schroeder, a certified physician's assistant, and Dr. Hansen, Wolvin demonstrated his continued back pain and both medical professionals indicated Wolvin's reduction in motion as a result. (R. 182, 178-79).

In May 2005, as part of his treatment plan, Wolvin went to a physical therapy session with Shelli Ness, a physical therapist, and another session with Dawn Schliem, a physical therapy assistant. (R. 176-77). Both professionals indicated in Wolvin's medical records that therapeutic exercise programs seemed to be producing beneficial results by decreasing Wolvin's symptoms, but also noted that when Wolvin returned to work, his symptoms tended to worsen. (R. 176).

Dr. Hansen noted on May 17, 2005 that Wolvin described his lower back pain as a "smoldering misery" and subsequently referred Wolvin back to Dr. Kahle to consider another MRI; Dr. Kahle ordered an MRI, the results of which indicated that there were no significant changes. (R. 173, 170). The scan continued to show multilevel degenerative disk disease with no obvious sources of significant nerve compression. (R. 170-72). Dr. Kahle opined that Wolvin would still not be a surgical candidate. (R. 172).

In August 2005, Wolvin visited Dr. Hansen after complaining that his back pain has progressed to the point where he was unable to work. (R. 166). Dr. Hansen reviewed the findings of Dr. Kahle's examination which Dr. Hansen described as "minimal." (R. 166). Dr. Hansen also reviewed Wolvin's prescriptions in order to alleviate some of the side effects, but Wolvin returned to see Dr. Hansen the following day stating his symptoms immediately worsened as a result of the prescription changes. (R. 163). Dr. Hansen made note in Wolvin's medical records that Wolvin appeared "acutely uncomfortable" and exhibited a "pronounced antalgic tilt to the right." (R. 163).

On September 7, 2005, a state agency medical consultant completed an RFC assessment concluding that Wolvin could occasionally lift 20 pounds, frequently lift 10 pounds, and stand and/or walk about six hours in an eight-hour workday. (R. 116).

Dr. Cynthia Bender, an orthopedic physiatrist, examined Wolvin in September and October of 2005, based upon a referral from Dr. Hansen. (R. 162). Dr. Bender noted that Wolvin was using Percocet and recommended a trial of methadone as part of a pain management. (R. 158). Wolvin was not able to tolerate the methadone, and returned to Dr. Bender who discussed other alternate pain management strategies with long-acting opiates, including OxyContin. (R. 155-56).

Wolvin sought a neurosurgical consultation from Dr. Trier in December of 2005 for a second opinion regarding his back pain. (R. 150). Dr. Trier examined Wolvin and discussed the MRI with him, stating that the results indicated Wolvin would still not be a surgical candidate. (R.150). Dr. Trier discussed a treatment plan with Wolvin emphasizing physical therapy and muscle strengthening. (R. 151).

Based upon Dr. Trier's recommendation, Wolvin attended physical therapy sessions with therapist Chad Kremer and Andrew Strope throughout January and February of 2006, but Wolvin indicated he was not experiencing much relief from the therapeutic exercises. (R. 142, 145-46, 148). Wolvin continued to visit Dr. Bender for pain relief prescriptions. (R. 140-41, 144, 147, 149).

In March 2006, Wolvin saw Dr. Carter, a neurosurgeon, for another opinion on his lower back pain. (R. 137). Dr. Carter reviewed the results of Wolvin's lumbar spine MRI and discussed the findings with Wolvin. Dr. Carter noted Wolvin had some degenerative disk disease in his lumbar spine at 2-3, 3-4, 4-5, and L5-S1. The MRI also revealed a central disk bulge at L5-S1, which was slightly larger in comparison to the 2003 study results, but there was still no impingement on the exiting nerves. (R. 138). Dr. Carter made note in Wolvin's medical record

that some of the symptoms Wolvin described to him could be attributed to degenerative disk disease, however it would be "difficult to treat because of the multilevel involvement." (R. 139). Dr. Carter went on to note that disk replacement or lumbar fusion is sometimes an option for degenerative disk disease, but such procedures are only approved when degenerative disk disease affects one-level involvement. (R. 139). Procedures such as disk replacement and lumbar fusion are generally not indicated for multilevel disk involvement because there is a very low success rate; therefore surgical intervention would not be appropriate for Wolvin. (R. 139). Dr. Carter recommended other treatment options, together with weight control. (Id.). Wolvin weighed 250 pounds when seen by Dr. Bender in December, 2005. (R. 155).

Wolvin sought the services of the Division of Vocational Rehabilitation (DVR) on October 19, 2005, in order to seek assistance in returning to work. (R. 89, 91-92). On May 15, 2006, Dr. Kahle, an orthopedic surgeon who previously examined Wolvin, wrote a letter to the DVR stating that Wolvin would require a non-physically demanding job in order to function consistently in the position. (R. 195). Dr. Kahle further cautioned that Wolvin would require a job that allowed him to change positions from sitting to standing and walking periodically to maintain comfort throughout the day, and avoid lifting and twisting. (R. 195). Dr. Kahle also noted that Wolvin should be limited to lifting no more than 20 pounds. (R. 195).

In January 2007, due to a change in insurance coverage, Wolvin saw Dr. Pickney to obtain more pain medication. Wolvin was "lying on the floor" attempting to relieve his pain when Dr. Pickney entered the room on Wolvin's visit January 16, 2007. (R. 319-20). Wolvin weighed 253 pounds at the time. Dr. Pickney had Wolvin sign a narcotic contract. (Id.) Wolvin failed to comply with Dr. Pickney's "Opiod Pain Agreement." (R. 315). He was then seen by Dr. Keehn who noted that a possible source of Wolvin's pain could be attributed to a disc herniation at the L5-

S1 level which "appear[ed] to contact the left S1 nerve." (R. 248). Dr. Keehn referred Wolvin to Dr. Dopf for a surgical consult. (R. 248).

Dr. Dopf performed a discogram on Wolvin which indicated degenerative disks at all four levels. (R. 250). Dr. Dopf opined that Wolvin would not be a surgical candidate because of the multilevel nature of Wolvin's condition. (R. 250). Wolvin underwent two more tests. An MRI on May 3, 2007, revealed a disk herniation at L5-S1 with disk protrusions and bulging at L2 through L5. (R. 272). Then, on July 30, 2007, a CT scan revealed disc protrusions, bilateral L5 pars fractures, slippage between discs, and a possible annular tear. (R. 339-40, 424). Throughout the fall of 2007, Wolvin continued to seek treatment for his lower back pain. (R. 322-24, 424).

**Wolvin's Testimony Before the ALJ**

Wolvin testified that he had to take time off from his job at Madison-Kipp Corporation due to a back injury in July 2005. (R. 464-70). Wolvin stated that his lower back symptoms worsened over time. (R. 469-70). Wolvin testified that he was treated primarily with medications because he was told he was not a surgery candidate because he had "too many disks in a row that are damaged." (R. 473). Besides medications, Wolvin testified that he occasionally lies on the floor to ease his pain. (R. 472). Wolvin also stated that he tries to limit his daily activities, and could only stand or sit for about twenty minutes and did not think he would be able to lift 20 pounds. (R. 477A-79, 481). Wolvin indicated that he used to hunt and fish, but no longer is able to do either, even though he still held a fishing license. (R. 480, 482-83). The only other activity Wolvin testified to was going to his friend's bar to "watch TV" and socialize. (R. 480-81).

**Vocational Expert's Testimony Before the ALJ**

Les Goldsmith, a vocational expert (VE), also provided testimony at Wolvin's hearing. (R.484-89). The VE was instructed by the ALJ to indicate if his testimony would conflict with the Dictionary of Occupational Titles (DOT) during the course of his testimony. (R. 487). The VE

testified that Wolvin had no real transferable skills, but in response to a hypothetical question based on an RFC for light work, the VE stated that both of Wolvin's past jobs fall within the hypothetical. In regard to the job of forklift operator, the VE used Wolvin's description and not the DOT definition. (R. 487-88). In response to a second hypothetical question, the VE said that if the hypothetical claimant had to lie down during the day at unscheduled times, there would be no competitive work available. (R. 488-89).

## III. STANDARD OF REVIEW: SUBSTANTIAL EVIDENCE

In addressing the issues raised by Wolvin, the court is limited to determining whether the ALJ's factual findings are supported by "substantial evidence." Young v. Barnhard, 362 F.3d 995, 1001 (7th Cir. 2004). The court may not re-weigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute its own judgment for that of the Commissioner. Id.; Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993).

The substantial evidence burden is satisfied when the evidence is such that a reasonable mind might accept it as adequate to support a conclusion. Williams v. Apfel, 179 F.3d 1066, 1071 (7th Cir. 1999). Although a mere scintilla of proof will not suffice, Butera v. Apfel, 173 F.3d 1049, 1055 (7th Cir. 1999), substantial evidence may be something less than the greater weight or preponderance of the evidence, Young v. Sullivan, 957 F.2d 386, 388 (7th Cir. 1992). Even if this court would reach contrary conclusions of fact, the decisions must be affirmed so long as his or her determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983). If the ALJ rejects uncontradicted evidence, reasoning for that rejection must be clearly articulated. Id.; Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). If the ALJ's decision rests on the credibility determination, this court will overturn that determination only if it is patently wrong. Powers v. Apfel, 173 F.3d 1049, 1055 (7th Cir. 2000). Special deference is appropriate

because the ALJ is in the best position to see and hear the witness and to determine credibility.  Id. at 435.

When the Commissioner denies social security benefits, the ALJ is required to "build an accurate and logical bridge from the evidence to [his or her] conclusions" so that a reviewing court may afford the claimant meaningful review of the SSA's "ultimate findings."  Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003) (citing Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002)); Steele v. Barnhart, 290 F.3d 396, 941 (7th Cir. 2002).  Further, the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  Steele, 290 F.3d at 940.

Finally, if the ALJ committed an error of law, this court may reverse the Commissioner's decision, regardless of whether it is supported by substantial evidence.  Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989).

## IV. DETERMINING DISABILITY: A FIVE-STEP ANALYSIS

A person is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A). In determining whether Wolvin was disabled, the ALJ applied the following five step inquiry: (1) whether Wolvin is currently unemployed; (2) whether Wolvin has a severe impairment; (3) whether Wolvin's impairment equates to one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appx. 1 ("Appendix"); (4) whether Wolvin is unable to perform past relevant work; and (5) whether Wolvin is incapable of performing work in the national economy.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920; Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step, or on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant

is not disabled.  Zurowski v. Halter, 245 F.3d 881, 885-86 (7th Cir. 2001) (citing Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)). The ALJ is required to carefully consider and explain in his or her decision the weight given to the opinions of state agency doctors and consultants.  SSR 96-6p.

At step 2, the ALJ determined that Wolvin's lumbar disc disease constituted a severe impairment.  At step 3, the ALJ concluded that his condition did not equate to any of the medical criteria of impairments listed in Appendix 1.  (R. 13.)  The ALJ then found Wolvin to have the residual functional capacity for a full range of light work, and the ALJ found plaintiff could perform his "past relevant work as a die cast worker (light) and a fork lift operator (light as performed)." (step 4).  (R. 14, 16.)  Further, even though the ALJ determined that Wolvin was able to return to his past relevant work, the ALJ also found Wolvin could perform a significant number of other jobs that exist in the national economy (step five).  (R. 17.)  The ALJ found that Wolvin was not disabled both because he could return to his past relevant work, and because Wolvin could perform a significant number of jobs considering his age, education, work experience and residual functional capacity.  (R. 16-18.)

**V. ANALYSIS**

**ISSUES PRESENTED**

Alleging three errors, Wolvin argues that this court should reverse or remand this case. First, Wolvin argues that ALJ Schneider did not comply with SSR 96-7p because he did not fully support his conclusions of Wolvin's credibility with the medical evidence.  Second, Wolvin argues that ALJ Schneider ignored medical evidence supporting Wolvin's claim.  Third, Wolvin argues that ALJ Schneider failed in his duty under SSR 00-4p, step five of the Sequential Analysis.  The Commissioner's response will be discussed during the court's analysis of each issue.

**The ALJ's Credibility Determination**

The court considers the issue of credibility an appropriate starting point for analysis because it impacts the Commissioner's RFC determination and finding at step four. The ALJ concluded that Wolvin's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but Wolvin's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 15). In support of this conclusion, the ALJ noted that although medical evidence of record indicated Wolvin had certain difficulties sitting and/or standing for extended durations, the file contained few indications of how Wolvin's condition would inhibit his ability to function. (R. 15). The ALJ based this conclusion on the most recent medical evidence in the file, which the ALJ found to demonstrate both improvement in Wolvin's pain levels and increased stability in his back condition. (R. 15).

The ALJ went on to note that medical records in both 2005 and 2006 indicated that Wolvin believed he could return to work and intended to return to work, as reported to his physicians and corroborated by his assistance from the Department of Vocational Rehabilitation (DVR). (R. 15). Further, the ALJ noted that Wolvin testified that he had a fishing license and goes fishing occasionally, went deer hunting in 2005, and "spends time at a friend's bar to socialize or watch TV." (R. 16). The ALJ found that Wolvin's participation in "strenuous and/or social activities is contradictory to his alleged limitations." (R. 16). The ALJ stated substantial weight was given to the medical records of the University of Wisconsin Hospital & Clinics, Dean Medical Center, Meriter Hospital, Dr. Magar, Dr. Hansen, Dr. Trier, Dr. Carter, and Dr. Kahle when supporting his conclusions of Wolvin's credibility. (R. 16).

The Commissioner thus responds to Wolvin's allegations that the ALJ did not fully support his conclusions of Wolvin's credibility with medical evidence by arguing that there was a lack of medical evidence supporting Wolvin's complaints, because the medical evidence Wolvin relied on

was only isolated incidents.  (Commissioner Brief at 12).  The Commissioner argues that the medical evidence in the record of Wolvin's pain was not "significant, long-standing, objective medical findings."  (Id.).  However, upon a careful review of the record, it is clear in this case that the ALJ ignored subjective and objective evidence of Wolvin's symptoms and utilized the record in a selective manner when evaluating the intensity and persistence of Wolvin's symptoms and the extent to which those symptoms limited his capacity for work.   In addition, the ALJ relied on his own assessment of the medical evidence and disregarded Wolvin's subjective statements regarding the severity of his pain and the extent of his limitations, without adequately explaining or fully addressing all of the SSR factors.

More about the medical evidence later, but turning to the SSR factors, an ALJ must comply with SSR 96-7p when evaluating credibility.   Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003); Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003).  SSR 96-7p requires that an ALJ carefully evaluate the "intensity, persistence, and functionally limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities."  SSR 96-7p.  Further, an ALJ's evaluation of the claimant's credibility must contain "specific reasons" and "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicatory gave to the individual's statements and the reasons for that weight."  SSR 96-7p; Weichel v. Astrue, 2008 U.S. Dist. LEXIS 62092, 22 (W.D. Wis. 2008).  An ALJ's credibility determination will not be upset unless it is "patently wrong" Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006), or "divorced from the facts contained in the record."  Berger v. Astrue,  516 F.3d 539, 546 (7th Cir. 2008).

In making a credibility determination, an ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence."  Blom v. Barnhart, 363 F. Supp. 2d 1041, 1051 (E.D. Wis. 2005) (quoting Knight v. Chater, 55 F.3d 309, 314 (7th Cir.

-11-

1995). In his decision, the ALJ set forth the factors required to be considered by SSR 96-7p. (R.14). They are: (1) the claimant's daily activities, (2) the location, duration, frequency and intensity of the pain, (3) precipitating and aggravating factors, (4) type, dosage, effectiveness and side effects of medication, (5) treatment other than medication, (6) any measures the claimant has used to relieve the pain or other symptoms, and (7) functional limitations and restrictions. SSR 96-7p; 20 C.F.R § 404.1529(c)(3). However, the ALJ may not simply "recite the factors that are described in the regulations," because without sufficient explanation by the ALJ, neither the applicant, nor subsequent reviewers will be able to ascertain how the ALJ weighed the applicant's testimony. SSR- 96-7p; Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

The ALJ referred to Wolvin's testimony regarding his participation in social activities and held that the activities were contradictory to his alleged pain limitations. The ALJ made little inquiry at the hearing into the level of activities in which Wolvin participates on a daily basis or what level of effort was actually required for each activity. The ALJ discounted Wolvin's allegations of pain without even considering the objective medical evidence corroborating Wolvin's statements about the intensity and persistence of his pain.

Under the facts of this case, a significant SSR factor that the ALJ failed to address in his credibility determination was the types, dosages, effectiveness and side effects of the medications Wolvin was prescribed for his lower back pain. The record reflects Wolvin's extensive history of medications that have been prescribed to alleviate his symptoms of lower back pain. Wolvin was prescribed 5 mg of Diazepam to be taken every six hours for pain relief after an emergency room visit in April 2005 for his back pain. (R. 185). Wolvin was also given a prescription for oxycodone and was told to take one every 4-6 hours, and prescriptions including Percocet, Naprosyn, and Valium to be taken as needed. (Id.) Wolvin was using Percocet and methadone as part of his pain management program by the fall of 2005. (R. 158). When Wolvin's prescriptions were no longer

-12-

effective in alleviating his pain, long acting opiates, including 10mg of OxyContin three times per day, were prescribed. (R. 155-56). In December of 2005, Wolvin's prescription was changed to 45mg of morphine three times per day in addition to Percocet three times per day when the OxyContin was not providing enough relief. (R. 144, 149). In March of 2006, Wolvin again switched prescriptions from morphine back to 10mg of OxyContin three times per day, but complained 10mg of OxyContin was not alleviating his pain, so the prescription was increased to 30mg three times per day. (R. 140). After changing insurance coverage in January of 2007, Wolvin violated the terms of a narcotic contract he signed with the prescribing doctor when he asked for a refill of his pain medications. (R. 315).

Wolvin's longitudinal history of prescriptions for pain medication and successively increasing dosages could shed light on the credibility of Wolvin's statements. An individual's symptoms can sometimes dictate a greater level of severity of impairment than can be shown by objective medical evidence alone. Therefore the ALJ must consider factors, such as the medications used by Wolvin, in addition to the objective medical evidence when assessing the credibility of Wolvin's statements. Since the ALJ neglected to discuss evidence in the record pertaining to the wide array of pain medications and increasing dosages Wolvin was prescribed, it was unclear how this factor weighed in the ALJ's credibility determination.

The ALJ also failed to discuss another SSR factor-- measures other than medications Wolvin has used to attempt to relieve his symptoms. The record contains references to measures Wolvin uses to relieve his pain, including lying flat on his back and changing positions from sitting to standing regularly throughout the day. Wolvin's physicians noted in his medical records that he was observed lying on his back on the floor of the examining room, seeking relief from his back pain, when the doctor entered the room. Wolvin also testified at the hearing that he often lies on his back or changes positions from sitting to standing in order to seek relief from his back pain

throughout the course of his day. Changing positions regularly throughout the work day would significantly diminish an individual's capacity for basic work activities. Whether credible or not, the ALJ failed to discuss the significance these facts in his decision or to solicit further inquiry at the hearing. As a result, the ALJ failed to follow the standards set forth in 20 C.F.R. §404.1529(c) by not considering any measures other than treatment that Wolvin uses to relieve pain, or indicating why such evidence was not persuasive.

In determining Wolvin's credibility, the ALJ chose to focus on Wolvin's social activities and select medical evidence opposing a finding of disability. For example, Wolvin has a marked history of lower back pain substantiated by a range of available evidence in the record including laboratory findings, (R. 225, 235, 250), statements from Wolvin, (R. 477A-480) and treating and nontreating sources about how the symptoms appear to affect Wolvin (R. 137, 139,142, 151, 195), and medical opinions of Wolvin's treating source and other medical opinions (R. 195, 248, 250, 272, 384-86). The ALJ summarily discounts such evidence in determining credibility.

The ALJ's failure to discuss several of the relevant SSR factors precludes this court from conducting a meaningful review of the ALJ's credibility determination. In sum, the credibility determination is not supported by substantial evidence for the reasons previously stated. Accordingly, this matter will be remanded on the issue of Wolvin's credibility. On remand, the ALJ must consider all of the relevant factors under SSR 96-7p, not just the medical evidence (or lack thereof), and articulate specific reasons for the weight attributed to the factors, and explain why he did not find persuasive the significant evidence in the record that was contrary to his credibility determination.

**Medical Evidence Consideration: Step Four Analysis**

At step four of the sequential evaluation process, the ALJ must determine if the individual has any severe impairment which prevents the performance of his past relevant work. (20 CFR

Case 2:08-cv-00476-AEG   Filed 04/28/09   Page 14 of 22   Document 21

404.1520(e); 20 CFR 416.920(e); SSR 82-62). Determination of a claimant's residual functional capacity ("RFC") forms the foundation of a step four analysis. (20 CFR 404.1520(e)). Residual functional capacity is based on all of the relevant evidence in the record, including medical source statements about what the individual can still do despite his or her impairment. (SSR 96-8p). An RFC determination must be based on all the relevant evidence in the case record including statements of the treating physician, medical history, medical signs and laboratory findings, reports of daily activities, effects of symptoms, and recorded observations. (Id.) A claimant's limitations with regard to his or her ability to walk, stand, lift, reach and pull, are all part of an RFC determination. After it is determined what a claimant can do despite physical limitations, the ALJ must determine if the claimant has the RFC to perform the requirements of his or her past relevant work. (20 CFR 404.1520(f)).

Social Security Ruling 96-2p sets forth the weight that an ALJ is to give to treating source statements. This Ruling has been repeatedly relied upon by this district and the Seventh Circuit. Barnett, 381 F.3d at 669; Blom, 363 F. Supp. 2d at 1059; Windus v. Barnhart, 345 F. Supp. 2d 928, 939-40 (E.D. Wis. 2004); Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1031 (E.D. Wis. 2004); Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001).

If the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the ALJ must afford it "controlling weight." 20 C.F.R. § 404.1527(d)(2) "Not inconsistent" means that a "well-supported treating source medical opinion need not be supported directly by all of the other evidence . . . as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." SSR 96-2p. Further, even if an ALJ finds that a treating source opinion is not entitled to controlling weight, he may not simply reject it. Id. Rather, he must evaluate the opinion's weight by considering the length, nature, and extent of the claimant's treatment relationships with his

physicians, the degree to which the opinion is supported by evidence, the opinion's consistency with the record as a whole, whether the doctor is a specialist, and "other factors." § 404.1527(d). Therefore, although a treating source's opinion may not meet the standard for controlling weight, "it may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. Most importantly, the ALJ must always "give good reasons" for his decision regarding the weight attributed to the treating source's opinion. Id.; Blom, 363 F. Supp. 2d at 1059; Wates v. Barnhart, 274 F. Supp. 2d 1024, 1034 (E.D. Wis. 2002).

The ALJ's rejection of medical reports was largely based on his conclusion that Wolvin's subjective complaints of pain were not credible, and thus, the medical conclusions that were based on Wolvin's subjective complaints were similarly not credible. However, as previously discussed, the ALJ failed to comply with SSR 96-7p in determining that Wolvin was not credible, therefore this error negatively affected the ALJ's rejection and assessment of the treating source medical evidence.

The ALJ's consideration of Wolvin's medical evidence, although supported by some evidence in the case record, does not make clear that the ALJ considered the entire case record. The medical evidence in the record and the ALJ's consideration of such evidence is imperative to set the foundation for the RFC determination and the limitations identified by Wolvin's physicians. The Commissioner argues that Wolvin did not meet his burden to show that he could not perform his past relevant work. (Commissioner's Brief at 9). Further, in supporting the ALJ's determination that Wolvin could perform a full range of light work, the Commission argues that there was no significant contrary evidence which the ALJ should have discussed in his decision. (Id.) However, the ALJ did not articulate with specificity the weight given to objective medical evidence in the case record and did not provide reasons why other information provided by treating

or examining physicians in the record was excluded from the ALJ's consideration in rendering a decision.

The ALJ indicated that Wolvin's medical file contained little indication of how Wolvin's condition affected his ability to function; however, the ALJ did not mention or articulate reasons why he disregarded evidence contradictory to this assertion. The ALJ determined that Wolvin had the residual functional capacity to perform a full range of light work, stating that Wolvin did not have any "postural, manipulative or environmental restrictions." (R. 14). In reaching this conclusion, the ALJ ignored crucial portions of the opinions of Drs. Kahle and Trier that Wolvin had certain restrictions and could not work in a job that would require repetitive bending, lifting and twisting. The ALJ selectively cited both doctors' opinions to support his assertion that Wolvin could lift up to twenty pounds. (R. 16, 195, 234).

The ALJ's treatment of Dr. Kahle's opinion is a prime illustration of his myopic assessment of Wolvin's medical record. Dr. Kahle's May 15, 2006 letter to the Department of Vocational Rehabilitation is summarized to the effect that Dr. Kahle indicated Wolvin would be able to work with only a lifting restriction of 20 pounds. (R.16, R. 195). The ALJ failed to mention that the rest of the letter which stated that Wolvin would require a "nonphysically demanding job" which avoided repetitive bending, lifting and twisting, and would allow Wolvin to change positions from sitting to standing and walking throughout the work day. (R. 195).

The ALJ similarly refers to the report of Dr. Trier to the effect that Wolvin could work with a lifting restriction of twenty pounds. (R. 16). Nowhere does the ALJ mention Dr. Trier's admonition that Wolvin should avoid a physically demanding job that requires repetitive bending, lifting and twisting. (R. 234). Such restrictions are significant because Wolvin described his job on the die casting machine as one that was physically demanding and involved lifting and twisting. (R. 486).

Case 2:08-cv-00476-AEG   Filed 04/28/09   Page 17 of 22   Document 21

Additionally, the parties raised an issue regarding the ALJ's consideration of Wolvin's claim that he could not undergo surgery. (Pl. Brief 9, Def. Brief 8). Although not directly cited in the ALJ's final decision as a determinative factor, the ALJ does include a reference to medical evidence in his decision which concluded that there was no indication for surgical intervention for Wolvin. (R. 15). The ALJ briefly addressed the issue of surgical intervention at the hearing, which created uncertainty in the parties regarding how the ALJ would consider the evidence because he did not fully demonstrate that he understood the significance. The record contains various references to indicate that Wolvin was not a likely candidate for surgical intervention, and the sum total of references creates ambiguity as to why Wolvin would not be considered an appropriate surgical candidate. Based on the ambiguity in the record, and in order to fully ascertain the medical significance of the evidence it was the ALJ's duty to solicit additional information regarding this evidence or to at least articulate in his decision how this evidence was considered. This is necessary so that upon subsequent review it is clear that the ALJ had an apparent understanding of the significance of the medical determination.

Based upon the ALJ's lack of consideration of all the relevant evidence, it is unclear whether Wolvin would be able to perform the requirements of his past relevant work.

**Step Five Analysis**

If the evaluation process proceeds to step five, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in large quantities in the national economy that a claimant can perform, based on his or her RFC, age, education, and work experience. (20 CFR 404.1512(g) and 404.1560(c)). The Social Security Administration must evaluate the claimant's ability to do other work in light of his or her RFC and vocational factors (age, education, literacy, and work history). (20 CFR 404.1560).

Vocational expert testimony can be used as evidence to demonstrate that other jobs exist in the national economy that the claimant could do. SSR 00-4p clarifies standards for the use of VE testimony at hearings before ALJs in disability decisions. SSR 00-4p. The ruling provides that before reliance is placed on VE evidence to support a disability determination or decision, an adjudicator must obtain "a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT)…" SSR 00-4p.

In determining whether Wolvin was disabled, the ALJ applied the five-step analysis in sequence. At step four in the analysis, the ALJ determined that Wolvin had the residual functional capacity (RFC) to perform a full range of light work. (R. 14). Next, as part of step four in the analysis, the ALJ determined that Wolvin had the residual functional capacity to perform requirements of his past relevant work, "as a die cast worker (light) and a fork lift operator (light as performed)." (R. 16). Since Wolvin was adjudged to have the residual functional capacity to do his past relevant work, Wolvin was not found to be disabled for purposes of DIB. (R.13). At this point in the evaluation it would have been appropriate for the ALJ to stop his analysis in accordance with the guidelines of the five-step analysis.

Nevertheless, the ALJ still proceeded to step five in the analysis. At this point, despite the fact that the ALJ previously determined that Wolvin had an RFC to perform a full range of light work, here the ALJ finds that Wolvin's ability to perform all or substantially all of the demands of the work may have been hampered by additional limitations. Ostensibly, to assess the effect of the limitations, the ALJ asked a VE to provide testimony to assist in determining the extent to which Wolvin's limitations would erode the unskilled light occupational base. (R. 17, 485-89). In regard to the VE's testimony, Wolvin also raises the issue that the ALJ failed in his duty under SSR 00-4p,

Case 2:08-cv-00476-AEG   Filed 04/28/09   Page 19 of 22   Document 21

which requires the ALJ to identify and obtain a reasonable explanation for any conflicts present between occupational evidence provided by the VE and information in the DOT.

In simply proceeding to make an alternative finding at step five in the sequential analysis, the ALJ has not committed a reversible error. The Commissioner argues that the entire challenge to the step five analysis is irrelevant because the ALJ could have relied on the Medical Vocational Guidelines, and not the testimony of the VE in making his finding. (Commissioner's Brief at 14). The Commissioner's argument highlights the inconsistency in the ALJ's approach. The question is, why did the ALJ utilize a vocational expert at step five? At step four, the ALJ determined that Wolvin had the RFC to perform a full range of light work, which means that at step five, the Medical Vocational Rule 202.21 should have been applied and a finding of "not disabled" would have been directed. Instead of relying on the Medical Vocational Rule to direct a finding of "not disabled," the ALJ called a vocational expert on the basis that Wolvin's ability to perform all or substantially all of the requirements of a full range of light work "has been impeded by additional limitations." (R. 17). But, as noted earlier, this statement is inconsistent with the ALJ's previous statement that Wolvin was able to perform a "full range of light work." (R. 14). Further, the ALJ fails to articulate exactly what Wolvin's additional limitations are, and did not include such limitations when posing the hypothetical to the vocational expert during the hearing. It would have been important that the hypothetical questions posed to the vocational expert fully explain Wolvin's impairments. It is unclear if the ALJ ascertained the demands of Wolvin's previous relevant work and compared that to his existing physical capacity when he determined Wolvin was capable of performing past relevant work.

This court has already determined remand is necessary based on the ALJ's flawed credibility determination and lack of proper consideration of the medical evidence. This flawed credibility determination has permeated other aspects of the ALJ's decision and would effect

evaluation of the successive steps in the sequential five-step analysis, including an assessment of Wolvin's residual functional capacity. Finally, since Wolvin's past work as a forklift operator was viewed "as performed," and the ALJ noted limitations on the full range of light work, an analysis in accordance with the requirements of  Strittmater v. Schweiker, 729 F.2d 507 (7th Cir. 1984) may be warranted.

**CONCLUSION**

The court finds that the ALJ failed to build an accurate and logical bridge from the evidence to his conclusions so as to allow this court to conduct a meaningful review of the SSA's ultimate finding regarding credibility.  Further, the ALJ failed to consider the entire case record or articulate specific reasons grounded in the evidence for the weight given to the individual's statements when determining Wolvin's credibility. The ALJ's flawed credibility determination undermined the finding of Wolvin's residual functional capacity, including his ability to perform the requirements of his past relevant work. Remand is necessary because, at times, the ALJ failed to solicit additional information when evidence in the record was ambiguous.  The ALJ also failed to solicit additional information or fully explain the weight given to contradictory medical evidence, thus failing to comply with SSR 96-2p.  The ALJ's selection of medical evidence relied upon in his decision, without further explanation, makes it appear as though the ALJ cherry-picked through the breadth of doctors' conclusions in order to arrive at his desired outcome.  In this manner the ALJ failed to comply with SSR 96-2p to explain why he was discounting certain conclusions.  For these reasons, and the other reasons more fully explained above, it is the conclusion of the court that remand is necessary.

On remand, the ALJ must either show why contrary medical evidence to his conclusion should be dismissed, or if not, reconsider Wolvin's RFC finding.  Further, the ALJ must consider all of the relevant factors under SSR 96-7p, not just the medical evidence (or lack thereof), and

Case 2:08-cv-00476-AEG   Filed 04/28/09   Page 21 of 22   Document 21

articulate specific reasons for the weight attributed to the factors. The ALJ must explain why he did not find persuasive the significant evidence in the record that was contrary to his credibility determination. Also on remand, additional findings must made as to whether or not Wolvin is capable of doing his past relevant work.

Additionally, upon complying with this court's instructions on remand, it may be necessary for the ALJ to solicit additional information from Wolvin's treating sources to fully and fairly determine the relevancy of the medical evidence concluding that Wolvin was not a surgical candidate. It is unclear if the ALJ had a clear understanding of the medical evidence regarding Wolvin's surgical candidacy. Even though such evidence does not directly appear in the ALJ's final decision, the overall lack of articulation in the decision makes it unclear if this factor did in fact weigh in the ALJ's credibility determination.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner is **reversed** and this case is hereby **remanded** for further review in accordance with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 28th day of April 2009.

_____
s/AARON E. GOODSTEIN
U.S. Magistrate Judge